**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:20-cv-3897 |
| Plaintiff, | : | |
| v. | : | |
| EIGHTY-THREE THOUSAND THIRTY-FIVE AND 00/100 DOLLARS ($83,035.00) IN UNITED STATES CURRENCY, | : | **VERIFIED COMPLAINT FOR FORFEITURE IN REM** |
| Defendant. | : | |

_____

Plaintiff, United States of America, by its undersigned counsel, alleges the following for its action against the defendant in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure.

## NATURE OF THE ACTION

1. This is a civil action *in rem* brought to enforce 21 U.S.C. § 881(a)(6), which provides for the forfeiture to the United States of:

   All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

## THE DEFENDANT IN REM

2. The defendant is Eighty-Three Thousand Thirty-Five and 00/100 Dollars ($83,035.00) in United States Currency. On or about February 4, 2020, the Drug Enforcement Administration ("DEA") seized the defendant from Craig Walker's checked luggage, following a consensual encounter with him at the John Glenn Columbus International Airport. The United

States has deposited the defendant into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

## JURISDICTION AND VENUE

3. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant under 21 U.S.C. § 881(a)(6). This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

4. This Court has *in rem* jurisdiction over the defendant under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio.

5. Venue is proper in this district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio and under 28 U.S.C. § 1395 because the defendant was found in the Southern District of Ohio.

## BASIS FOR FORFEITURE

6. The defendant is subject to forfeiture under 21 U.S.C. § 881(a)(6) because it represents property furnished or intended to be furnished in exchange for a controlled substance, represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846.

## FACTS

7. On or about February 4, 2020, members of the Columbus, Ohio Airport DEA Group at the John Glenn Columbus International Airport ("CMH") received information regarding the suspicious travel of a passenger identified as Craig Walker ("Walker").

a. Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that persons engaged in the commercial interstate distribution of controlled substances frequently use CMH and the aircraft that arrive and depart there to transport drug sales proceeds, and funds to be used to purchase drugs, in and out of Columbus. Those proceeds and funds are usually in the form of United States currency.

b. Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that persons engaged in the commercial interstate distribution of controlled substances frequently use couriers to transport controlled substances, drug sales proceeds, and funds to be used to purchase drugs in and out of Columbus. CMH and the aircraft that arrive and depart there are relied upon as a means of sending and receiving such couriers.

c. Members of the Columbus, Ohio Airport DEA Group are trained and experienced in investigating illegal drug and drug currency couriers, and they have learned to observe and detect the behavior, characteristics, and other travel indicators that help them to distinguish suspected illegal drug and drug currency couriers from the normal, non-criminal traveling public.

d. Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that illegal drug and drug currency couriers often purchase airline tickets within 72 hours of travel to a known source area for illegal drugs like Los Angeles, California, or to a known destination area for illegal drugs like Columbus, Ohio.

e. Members of the Columbus, Ohio Airport DEA Group also know that

illegal drug and drug currency couriers make multiple, last-minute changes to their flight reservations.

    f.    DEA Special Agent Jonathan Hanley ("SA Hanley"), DEA Task Force Officer Andrew D'Orazio ("TFO D'Orazio"), DEA Task Force Officer Eric Doyle ("TFO Doyle"), and DEA Task Force Officer Raul Melo ("TFO Melo") are members of the Columbus, Ohio Airport DEA Group.

8.    Based on the information received, the officers learned that on January 30, 2020, Walker purchased a round-trip ticket to travel from the Los Angeles International Airport ("LAX") to CMH. On February 1, 2020, Walker flew from LAX to CMH with two checked bags. Walker originally was set to return to LAX on February 3, 2020, but he changed his return flight twice and scheduled his flight back to LAX on Southwest Flight #1850, which was set to depart from CMH on February 4, 2020, at approximately 1:15 p.m. Walker checked only one bag on his return flight.

9.    On February 4, 2020, members of the Columbus, Ohio Airport DEA Group went to the CMH security checkpoint area to locate Walker. TFO Doyle proceeded to CMH's baggage make-up area for Southwest Airlines to find Walker's checked bag. TFO Doyle located a large black, hard-sided roller bag displaying a luggage tag for Southwest Flight #1850 and the name "WALKER/CRAIG."

10.    At approximately 12:35 p.m., TFOs D'Orazio and Melo observed Walker as he exited the CMH security checkpoint area. Walker was carrying a duffle bag. Walker's flight was set to board at 12:45 p.m. Based on their training and experience, officers know that drug and drug currency couriers commonly arrive as close to the boarding time as possible in an effort to thwart detention by law enforcement.

11. TFOs D'Orazio and Melo approached Walker in a way as not to block his freedom of movement and identified themselves as law enforcement with the DEA. When TFO D'Orazio asked Walker whether they could speak with him, he agreed but continued to walk toward his gate.

12. TFO D'Orazio advised Walker that they were speaking to him because of his ticket purchase and asked Walker why he purchased his ticket so close to his flight to CMH. TFO D'Orazio also asked Walker why he checked two bags on his flight to CMH but was only checking one bag on his flight back to LAX. As TFO D'Orazio spoke, Walker continued to walk, keeping his eyes forward, and he did not answer any of TFO D'Orazio's questions.

13. TFO D'Orazio repeated his questions to Walker. Walker continued to keep his eyes forward and did not respond. TFO D'Orazio then asked Walker if he had heard him. Walker looked back at TFO D'Orazio, confirmed that he had heard the questions, but he still did not answer them. At that time, the officers noted that Walker appeared to pass the gate assigned to his flight and advised him of this.

14. TFO D'Orazio then asked Walker for consent to search his checked bag and the duffle bag he was carrying. Walker consented. Upon receiving consent, TFO Doyle notified TFO D'Orazio that Walker's checked bag had a combination lock on it. TFO D'Orazio asked Walker if he was willing to provide the combination to open the bag; Walker did not provide the combination. TFO D'Orazio then asked Walker if he knew the combination or if he was carrying the bag for someone else. Walker did not answer the questions but advised that he no longer wanted his checked bag to be searched and that he was not going to answer any more questions. Walker did allow TFO Melo to search his carry-on, duffle bag. TFO Melo did not find any contraband or currency in the duffle bag.

15. While members of the Columbus, Ohio Airport DEA Group spoke to Walker,

5

Columbus Regional Airport Authority Police K-9 Officer Dale Beam ("Officer Beam") and certified narcotic detection K-9 "TRex" responded to a request for assistance from TFO Doyle to conduct a K-9 sniff of luggage in the CMH baggage make-up area for Southwest Airlines. Upon arriving, Officer Beam found approximately eight pieces of luggage placed in a row on the floor of the baggage make-up area.

16. K-9 TRex sniffed the pieces of luggage from left to right. As K-9 TRex passed a large black, hard-sided roller bag, Officer Beam noted that K-9 TRex showed a change in behavior. K-9 TRex's head snapped back to the roller bag, he sniffed closely at the seams, his breathing quickened, and he squared off to the bag. K-9 TRex indicated a positive alert for the odor of narcotics by placing his front paws on top of the large black, hard-sided roller bag and scratching it. Officer Beam then advised TFO Doyle of the positive alert. K-9 TRex was given praise and continued the sniff of the remaining luggage. He did not show a change in behavior to any other piece of luggage. The airline tag attached to the large black, hard-sided roller bag indicated that the bag belonged to Walker.

17. Upon learning that a trained, narcotics detection K-9 had alerted to the odor of narcotics on Walker's checked luggage, TFO D'Orazio notified Walker. Walker did not respond.

18. TFO D'Orazio advised Walker that he was going to seize his checked bag in order to obtain a search warrant and provided Walker with a copy of the DEA's receipt form for the seizure. Walker refused to sign the DEA receipt form but provided an address in Illinois for receiving information about the seizure. The officers noted that Walker previously had mentioned to TFO Melo that he was a barber in Los Angeles, California. Walker declined to be interviewed in private about his travel or luggage, and the DEA officers departed the area.

19. Following the positive narcotic K-9 alert to Walker's checked bag and Walker's

declination of consent to search, TFO Doyle obtained a search warrant for Walker's checked bag from Franklin County Municipal Court Judge Andrea C. Peeples.

20. On February 4, 2020, TFO Doyle executed the search warrant for Walker's checked bag. Upon opening the bag, the DEA officers found a single, large vacuum-sealed bag. Inside the vacuum-sealed bag, officers found a thick blanket. Once unrolled, officers found several pairs of pants which had numerous bundles of rubber-banded currency hidden in them. The DEA officers estimated that there were approximately 100 bundles of currency. The officers also noted that at least one pair of pants appeared to be new and bore a "NOBO" retail tag with pink writing. Based on their training and experience, officers know that drug currency couriers commonly conceal money inside clothing and vacuum-sealed packaging in an effort to prevent its discovery by law enforcement. As a result of the investigation, TFO Doyle seized the currency as drug proceeds.

21. The DEA officers then requested assistance from Officer Beam and K-9 TRex to conduct a K-9 sniff of the seized currency at the DEA's airport office.

22. The currency seized from Walker's bag was placed in a new United States Postal Service Priority Mail package ("USPS package") and sealed. The narcotic detection K-9 sniff consisted of two separate K-9 sniffs as follows.

    a. Ten USPS packages were placed in a circle in the DEA office. Three packages were empty, and seven contained shredded, circulated and un-circulated currency. Officer Beam and K-9 TRex entered the area, and Officer Beam gave K-9 TRex the command to search. K-9 TRex sniffed all ten packages and the room and did not show any change in behavior. Officer Beam and K-9 TRex then left the area.

7

   b. The DEA officers replaced one of the packages with the USPS package that contained the money from Walker's checked bag. The location of the money was unknown to Officer Beam. Officer Beam and K-TRex returned to the area, and Officer Beam gave K-9 TRex the command to search. As K-9 TRex sniffed the packages, Officer Beam noted that K-9 TRex showed a change of behavior on one of the packages. As K-9 TRex sniffed past one of the packages, he snapped his head back. Officer Beam noted that K-9 TRex's breathing quickened, he squared up to the package, and he indicated a positive alert for the odor of narcotics by scratching on the package. The DEA officers advised Officer Beam that it was the package containing the money seized from Walker's checked bag.

23. An official count of the United States currency seized from Walker's checked bag revealed that the currency totaled $83,035.00 (the defendant).

| Denomination | Quantity | Total |
|---:|---:|---:|
| $100 | 81 | $8,100.00 |
| $50 | 44 | $2,200.00 |
| $20 | 3,370 | $67,400.00 |
| $10 | 298 | $2,980.00 |
| $5 | 471 | $2,355.00 |
|  |  | $83,035.00 |

24. Upon conducting further investigation, SA Hanley learned that between January 18, 2020, and February 3, 2020, a telephone number used by Walker was in contact with a phone number associated with Jimmell Woods at least 49 times.

25. SA Hanley also learned that on or about May 19, 2020, officers with the Phoenix Police Department seized approximately $16,495.00 from Jimmell Woods, following an encounter with him at the Phoenix Sky Harbor International Airport. According to the Phoenix Police

Department Incident Report, Jimmell Woods admitted to receiving marijuana shipments from California. The report also indicated that an officer observed photographs on Jimmell Woods' cellular telephone that appeared to show receipts for packages being shipped from California to Chicago, Illinois.

26. Walker's criminal history includes, among other offenses, convictions for manufacture or delivery of cocaine and aggravated unlawful use of weapon. On September 24, 2015, in the Circuit Court of Jackson County, Illinois, Walker was sentenced to nine years in prison for manufacture or delivery of cocaine, followed by three years of mandatory supervised release, to run concurrently with three years in prison for aggravated unlawful use of weapon, followed by one year of mandatory supervised release. The court ordered Walker to serve 75% of the sentence and gave him credit for 2,030 days in custody.

27. On or about May 4, 2020, the DEA received a timely claim from Walker in the administrative proceedings, asserting an interest in the defendant. In his claim, Walker states that he and Antoinette Ford are partners in a haircutting business, which they established in 2017 and has clients located in Chicago, Illinois; Los Angeles, California; and Columbus, Ohio. According to Walker, they also generate revenue from ownership of two soda machines and a snack vending machine.

28. Walker indicated that on the day of the seizure, he was relocating his business from Chicago, Illinois, to Los Angeles, California, but provided no explanation for his travel to Columbus, Ohio. Walker claims that the defendant was accumulated between 2017 and 2020, from their business activities and was stored in a safe in his house.

29. In support of his claim, Walker provided a document entitled "Appointments summary" dated August 1, 2019, to April 25, 2020, for Craig Walker and Chocolate Cuts; his 2019

9

federal and state income tax return documents; and a single page of a six-page bank summary from 2019, which are further described as follows.

  a. The appointment document appears to show 1,081 appointments with a total value of $76,265.00. Walker did not provide information explaining or authenticating the document.

  b. Walker's 2019 federal income tax return provides that he is a single filer with no dependents and an adjusted gross income of $231.00. According to the Schedule C "Profit or Loss From Business" form attached to the return, Walker operated a barbershop business, "Cuts By Craig," with gross receipts totaling $103,500.00 and a gross income of $91,500.00. He also reported expenses totaling $91,269.00, providing for a profit of only $231.00.

  c. Walker's state income tax return includes his federal adjusted gross income of $231.00 and a federal Earned Income Credit of $17.00.

  d. On the first page of Walker's six-page Bank of America "Your Adv SafeBalance Banking" statement for Account No. 9622, the account summary shows a beginning balance on March 9, 2019, of $188.02. After $2,375.97 in additions and $2,395.76 in deductions and fees, the ending balance on April 9, 2019, was $168.23.

30. Based on the foregoing facts, the United States asserts that the defendant, $83,035.00 in United States currency, represents property furnished or intended to be furnished in exchange for a controlled substance, represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846. Therefore, the property is subject to forfeiture to

the United States under 21 U.S.C. § 881(a)(6).

## CLAIM FOR RELIEF

WHEREFORE, the plaintiff respectfully requests that:

(a) pursuant to Rule G(3)(b)(i), Supplemental Rules, the Clerk issue a warrant of arrest *in rem*, directing the United States to arrest and seize the defendant and to retain the same in its custody subject to further order of the Court;

(b) the Court, pursuant to Rule G(4), Supplemental Rules, direct the United States to give notice to all persons and entities having an interest in the defendant to assert, in conformity with the law, a statement of any interest they may have, including notice by publication on the official government website, www.forfeiture.gov, for 30 consecutive days;

(c) the forfeiture of the defendant to the United States be confirmed, enforced, and ordered by the Court;

(d) the Court thereafter order the United States to dispose of the defendant as provided by law; and

(e) the Court award the United States all other relief to which it is entitled, including the costs of this action.

                                                Respectfully submitted,

                                                DAVID M. DEVILLERS
                                                United States Attorney

                                                s/Deborah D. Grimes
                                                DEBORAH D. GRIMES (0078698)
                                                Assistant United States Attorney
                                                Attorney for Plaintiff
                                                221 East Fourth Street, Suite 400
                                                Cincinnati, Ohio 45202
                                                (513) 684-3711
                                                Deborah.Grimes@usdoj.gov

## VERIFICATION

I, Eric M. Doyle, hereby verify and declare under the penalty of perjury that I am a Task Force Officer with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint for Forfeiture and know the contents thereof, and that the matters contained in the complaint are true to my own knowledge, except those matters stated to be alleged on information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, and my investigation of this case.

I hereby verify and declare under the penalty of perjury that the foregoing is true and correct.

_7-31-20_
Date

_____
ERIC M. DOYLE, Task Force Officer
Drug Enforcement Administration